Judge KORMAN concurs in a separate opinion.
EDWARD R. KORMAN, District Judge:
This case involves a dispute over the ownership of a drawing by Egon Schiele (the “Drawing”) between plaintiff David Bakalar, the current possessor of the Drawing, and defendants Milos Vavra and Leon Fischer, heirs to the estate of Franz Friedrich Grunbaum (“Grunbaum”). Although the Drawing was untitled by the artist, one of the descriptive titles by which it is known is “Seated Woman with Bent Left Leg (Torso).”
Vavra and Fischer allege the following facts in their complaint. The Drawing was one of eighty-one Schieles that were included in a collection of 449 artworks owned by Grunbaum, an Austrian cabaret artist, and kept in his apartment in Vienna. Grunbaum was deprived of his possession and dominium over the Drawing after being arrested by the Nazis and signing a power of attorney while imprisoned at Dachau. The power of attorney, dated July 16, 1938 (four months after his imprisonment), authorized his wife Elisabeth “to file for me the legally required statement of assets and to provide on my behalf all *138 declarations and signatures required for their legal effect according to the statutory-provisions, and to represent me in general in all my affairs.” (A-936.)
The statement of assets, to which the power of attorney referred, required Jews to list all of their property. The information was then used by the Nazis to impose confiscatory taxes and penalties of various kinds.[1] The power to represent Grun-baum “in all [his] affairs” enabled the Nazis to compel Elisabeth to dispose of Grun-baum’s assets for the purpose of paying the imposed taxes and penalties.[2] Indeed, in a report dated four days after the execution of the power of attorney, Franz Kieslinger, an appraiser for the Nazis with the Viennese auction house Dorotheum- — - which was “a prime selling point of lootfed] art in Austria” (A-1265) — conducted an appraisal of the 449 artworks that Grunbaum kept in his apartment, including the eighty-one Schieles. On August 1, 1938, Mrs. Grunbaum signed a List of Assets “for Franz Freidr. Grunbaum, according to Power of Attorney dated July 16, 1938.” (A-933.) The valuation she placed on it was identical to that which Kieslinger had assigned it.
The manner in which the Drawing made its way from Vienna to Galerie St. Etienne, the New York art gallery from which Ba-kalar purchased it, is unclear. Grunbaum died in Dachau in 1941. The Registration of Death, a document filed in the district court of Vienna in which Mrs. Grunbaum reported the death of her husband, states that “[a]ecording to the deceased’s widow, Elisabeth Sara Grunbaum, there is no es *139 tate.” (A-982.) Mrs. Grunbaum was arrested by the Nazis on October 5, 1942, and died shortly thereafter in a concentration camp in Minsk. The Drawing was purchased along with forty-five other Schieles by Galerie Gutekunst, a Swiss art gallery, in February and May of 1956. The district judge found that the seller was Mathilde Lukacs-Herzl (“Lukacs-Herzl” or “Lukács”), the sister of Mrs. Grunbaum. Later the same year, on September 18, 1956, the Drawing was purchased by the Galerie St. Etienne and was shipped to it in New York. On November 12, 1963, the latter sold the drawing to David Bakalar for $4,300.
Bakalar, a resident of Massachusetts, filed this action seeking a declaratory judgment that he is the rightful owner of the Drawing. The complaint was filed after a winning bid of approximately $675,000 for the Drawing at a Sotheby’s auction was withdrawn, apparently because of a letter written on behalf of Milos Vavra and Leon Fischer, which challenged Bakalar’s title. Vavra and Fischer, who have been formally designated by an Austrian court as the legal heirs to the estate of Grunbaum, are the two named defendants in this case. In response to Baka-lar’s complaint, Vavra and Fischer, who are residents of the Czech Republic and New York, respectively, filed counterclaims for declaratory judgment, replevin, and damages. After a bench trial, a judgment was entered in the Southern District of New York (Pauley, /.), based on findings of fact and conclusions of law, which sustained the claim of David Bakalar that he was the rightful owner.
In his post-trial findings of fact and conclusion of law, the district judge reaffirmed his pre-trial ruling that Swiss law applied. Bakalar v. Vavra, 2008 WL 4067335, at *6 (S.D.N.Y. Sept. 2, 2008) (citing Bakalar v. Vavra, 550 F.Supp.2d 548, 550 (S.D.N.Y.2008)). Under Swiss law, “a person who acquires and takes possession of an object in good faith becomes the owner, even if the seller was not entitled or authorized to transfer ownership.” Id. at *7. One “relevant exception to this rule is that if the object had been lost or stolen, the owner who previously lost the object retains the right to reclaim the object for five years.” Id. The district judge proceeded to hold that, because Lu-kacs-Herzl “possessed the Drawing and the other Schiele works she sold” in 1956, the Galerie Gutekunst, as buyer, “was entitled to presume that she owned them.” Id. Because Galerie Gutekunst was a good faith purchaser, and because the Grun-baum heirs had “not produced any concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum,” Bakalar acquired good title when he purchased the Drawing from Galerie St. Etienne. Id. at *8. Nevertheless, even if the Drawing had been stolen at some point prior to the Galerie Gute-kunst’s purchase in 1956, “any absolute claims to the property” by those from whom the Drawing was stolen “expired five years later, in 1961,” pursuant to Swiss law. Id. at *7.
DISCUSSION
I
Because jurisdiction in this case is predicated on diversity of citizenship, New York’s choice-of-law rules apply. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Before engaging in a choice-of-law analysis, we turn to the threshold question whether there is a difference between the laws of Switzerland and New York upon which the outcome of the case is dependent. We conclude that there is a significant difference that is reflected in the laws and policies of these two jurisdictions.
*140 A. Swiss Law and Practice
The preceding summary of the district judge’s findings of fact and conclusions of law contain a description of Swiss law, to which we add only a few words. Under Article 934 of the Swiss Civil Code, as summarized by Bakalar’s expert, “a buyer acting in good faith will acquire valid title to stolen property after a period of five years. After the five year period, a previous owner of a stolen object is no longer entitled to request the return of the stolen object from a good-faith possessor.” (A-706) (emphasis in original). Moreover, as Bakalar’s expert explained, Swiss law also presumes that a purchaser acts in good faith, and a plaintiff seeking to reclaim stolen property has the burden of establishing that a purchaser did not act in good faith. See also In re Holocaust Victim Assets Litig., 105 F.Supp.2d 139 (E.D.N.Y. 2000), aff'd, 413 F.3d 183, 186 (2d Cir. 2005); Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Aids, Inc., 717 F.Supp. 1374, 1400 (S.D.Ind.1989), aff'd, 917 F.2d 278 (7th Cir. 1990). Significantly, according to Baka-lar’s expert,
[tjhere has never been a legal presumption that art works with a potential relationship to Germany during World War II (i.e. emanating from a German collection or created by artists deemed “degenerate” by the Nazis) would in general and per se be tainted, and that a dealer accepting such art works would automatically be subject to a heightened standard of diligence in the 1950s. Such a presumption did not in the 1950s and does not today exist in Swiss law.
See also Final Report of the Independent Commission of Experts (Bergier Commission Report), Switzerland, National Socialism and the Second World War 364 (2002).
While it is true, as Bakalar’s expert continues, that “[i]n 1987, the Swiss Federal Supreme Court raised the standards of due diligence with respect to sales transactions involving second-hand luxury automobiles,” and later to the antiquities business because “in these businesses stolen property is known to be frequent; therefore a heightened alertness may be expected from buyers in these sectors,” and “[wjhile some Swiss legal commentators are of the opinion that the art market should also fall into this category of businesses at risk, the Swiss Federal Supreme Court has not extended the stricter standards to transactions with works of art,” (A-714) (emphasis in original).
Nevertheless, Bakalar argues that Swiss law is “not blind to the rights of dispossessed former owners,” and does not “reflect indifference to the possibility of theft.” While this benign assessment of Swiss law has been disputed by others, see e.g., Hector Feliciano, The Lost Museum: The Nazi Conspiracy to Steal the World’s Greatest Works of Aid 155 (1st ed.1995), we have no occasion to address this issue. Instead, we simply note the obvious: Swiss law places significant hurdles to the recovery of stolen art, and almost “insurmountable” obstacles to the recovery of artwork stolen by the Nazis from Jews and others during World War II and the years preceding it. In re Holocaust Victim Assets Litig., 105 F.Supp.2d 139 at 159 (“[T]he legal and practical obstacles to the recovery of [stolen] art ... are already substantial, if not insurmountable.”).
B. New York Law
Unlike Switzerland, in New York, a thief cannot pass good title. See Menzel v. List, 49 Misc.2d 300, 305, 267 N.Y.S.2d 804 (1966), modified as to damages, 28 A.D.2d 516, 279 N.Y.S.2d 608 (1st Dep’t 1967), rev’d as to modification, 24 *141 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969); see also Silsbury v. McCoon, 3 N.Y. 379, 383-84 (1850). This means that, under New York law, as Menzel v. List specifically held and one scholar observed, “absent other considerations an artwork stolen during World War II still belongs to the original owner, even if there have been several subsequent buyers and even if each of those buyers was completely unaware that she was buying stolen goods.” Michelle I. Turner, Note, The Innocent Buyer of Art Looted During World War II, 32 Vand. J. Transnat’l L. 1511, 1534 (1999). The manner in which the New York rule is applied reflects an overarching concern that New York not become a marketplace for stolen goods and, in particular, for stolen artwork.
The leading New York case in this area is Solomon R. Guggenheim Found. v. Lubell, 77 N.Y.2d 311, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991), which principally addresses the issue of when a cause of action for replevin accrues, thus triggering the three-year statute of limitations. The ease was decided against the backdrop of the New York market in stolen artwork. As one commentator has observed, “[b]ecause stolen art work can be very valuable, may eventually filter into the open market, and may be handled by the shadowy institution of the art gallery, art owners may be victimized by international trading in stolen art. Original owners, however, have only a few fragmentary and little-known mechanisms by which to register or recover their stolen art objects.” Sydney M. Drum, Comment, DeWeerth v. Baldinger: Making New York A Haven for Stolen Art?, 64 N.Y.U. L.Rev. 909, 944 (1989). Moreover, they are “further disadvantaged by the art dealers’ usual practice of not examining the sources of the art works in which they trade. While art dealers protest that they are only protecting the desire of their wealthy clients to remain anonymous, and that they are under no legal duty to inquire into the sources of art work they trade, such anonymity removes illegitimate transactions from needed scrutiny.” Id. at 912-13.
The circumstances that Drum described are reflected in the market conditions described in the opinion in Lubell. Indeed, the opening paragraph begins with the observation that “[t]he backdrop for this replevin action is the New York City art market, where masterpieces command extraordinary prices at auction and illicit dealing in stolen merchandise is an industry all its own.” Lubell, 77 N.Y.2d at 314, 567 N.Y.S.2d 623, 569 N.E.2d 426 (internal citation omitted). Lubell then observed that “New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value.” Id. at 317, 567 N.Y.S.2d 623, 569 N.E.2d 426. One aspect of that protection is the rule that a cause of action for replevin against the good-faith purchaser of stolen property “accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it. Until demand is made and refused, possession of the stolen property by the good-faith purchaser for value is not considered wrongful” and the statute of limitations does not begin to run. Id. at 317-18, 567 N.Y.S.2d 623, 569 N.E.2d 426 (internal citations omitted).
While the Court of Appeals acknowledged that “the demand and refusal rule is not the only possible method of measuring the accrual of replevin claims, it does appear to be the rule that affords the most protection to true owners of stolen property,” and it rejected any suggestion that less protective measures should be adopted. Id. at 318, 567 N.Y.S.2d 623, 569 N.E.2d 426. Thus, it declined to adopt a *142 discovery rule “with the Statute of Limitations running from the time that the owner discovered or reasonably should have discovered the whereabouts of the work of art that had been stolen.” Id. at 318-19, 567 N.Y.S.2d 623, 569 N.E.2d 426. Indeed, the Court of Appeals observed that New York had already considered — and rejected— the adoption of such a rule. Specifically, a bill proposing that a museum would be immune from future claims once it “gave required public notice of acquisition and a three year statute of limitations period had passed,” Drum, supra, at 936, was vetoed by Governor Mario Cuomo, who “stated that he had been advised by the State Department that the bill, if it went into effect, would have caused . New York to become ‘a haven for cultural property stolen abroad since such objects [would] be immune from recovery under the limited time periods established by the bill.’ ” Lubell, 77 N.Y.2d at 319, 567 N.Y.S.2d 623, 569 N.E.2d 426 (alteration in original).
The Court of Appeals observed that “[t]he history of this bill and the concerns expressed by the Governor in vetoing it, when considered together with the abundant case law spelling out the demand and refusal rule, convince us that that rule remains the law in New York and that there is no reason to obscure its straightforward protection of true owners by creating a duty of reasonable diligence.” Id. In justifying this holding, the Court of Appeals observed that its decision was
... in part influenced by [its] recognition that New York enjoys a worldwide reputation as a preeminent cultural center. To place the burden of locating stolen artwork on the true owner and to foreclose the rights of that owner to recover its property if the burden is not met would, we believe, encourage illicit trafficking in stolen art. Three years after the theft, any purchaser, good faith or not, would be able to hold onto stolen art work unless the true owner was able to establish that it had undertaken a reasonable search for the missing art. This shifting of the burden onto the wronged owner is inappropriate. In our opinion, the better rule gives the owner relatively greater protection and places the burden of investigating the provenance of a work of art on the potential purchaser.
Id. at 320, 567 N.Y.S.2d 623, 569 N.E.2d 426.
This is not all the Court of Appeals held in Lubell. In the course of its opinion, it went on to agree with the Appellate Division, “for the reasons stated by that court, that the burden of proving that the painting was not stolen properly rests with [the possessor].” Id. at 321, 567 N.Y.S.2d 623, 569 N.E.2d 426. Specifically, the Appellate Division had held that “an issue of fact exists as to whether the gouache was stolen, and that the burden of proof with respect to this issue is on defendant, it being settled that a complaint for wrongful detention contains every statement of fact essential to a recovery where it alleges the plaintiffs ownership of the property and the defendant’s possession and refusal on demand to deliver.” Solomon R. Guggenheim Found. v. Lubell, 153 A.D.2d 143, 153, 550 N.Y.S.2d 618 (1st Dep’t 1990) (citing 23 N.Y. Jur.2d, Conversion, and Action For Recovery of Chattel, § 175, at 422). While the Appellate Division recognized that the burden it was placing on the good-faith possessor was an “onerous one,” it held that “it well serves to give effect to the principle that persons deal with the property in chattels or exercise acts of ownership over them at their peril.” Id. (internal citations omitted).
II
Against this backdrop, we turn to the issue of the appropriate choice of law *143 and the issue of whether the Drawing was stolen. We address first the choice of law issue, because if Swiss law applies, it is immaterial whether the Drawing was stolen. Specifically, the district judge held: “Under New York’s choice of law rules, questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer.” 550 F.Supp.2d at 550 (quoting Greek Orthodox Patriarchate of Jerusalem v. Christie’s, Inc., 1999 WL 673347, at *4-5 (S.D.N.Y. Aug. 30, 1999)). Accordingly, he concluded that “[t]he Court must apply the law of the country where title passed, if at all.” (Id.) (internal quotation omitted). In adopting this choice-of-law rule, the district judge relied heavily on the opinion of Judge Mishler in Kunstsammlungen Zu Weimar v. Elicofon, 536 F.Supp. 829, 845-46 (E.D.N.Y.1981), aff'd, 678 F.2d 1150, 1157-58 (2d Cir.1982).
Elicofon arose out of the theft of two Albrecht Duerer paintings possessed by the predecessor of the Kunstsammlungen zu Weimar, a German art museum. In July 1945, during the American occupation of the town of Weimar, the paintings were stolen from a castle where they had been placed for safekeeping. Edward Elicofon purchased the paintings in good faith in 1946 from an ex-serviceman who appeared at his Brooklyn, New York residence and claimed that he had purchased them in Germany. Elicofon, 536 F.Supp. at 830, 833. Some twenty years later, upon the discovery of the location of the Duerer paintings, the museum demanded their return. Elicofon refused, and the museum sued to recover the paintings. Elicofon moved for summary judgment under a provision of German property law called Ersitzung, which allowed title to moveable property to be obtained by its good faith acquisition and possession without notice of a defect in title for a period of ten years from the date on which the rightful owner loses possession.
Judge Mishler concluded that it was unnecessary to reach the substantive issues in connection with German law “because under New York choice of law theory, German law is not applicable to determine whether Elicofon acquired title to the paintings.” Id. at 845. Specifically, Judge Mishler observed in the language quoted above that “New York’s choice of law dictates that questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer.” Id. at 845^16. Because Elicofon purchased the paintings in New York, Judge Mishler concluded that New York law applied. Moreover, Judge Mish-ler concluded that even applying the more modern “interest analysis,” New York substantive law still applied. Id.
The problem with the traditional situs rule, upon which Judge Mishler relied in part and upon which the district judge here relied exclusively, is that it no longer accurately reflects the current choice of law rule in New York regarding personal property. This is demonstrated by our decision in Karaha Bodas Co., LLC v. Perusahaan Pertambangan Dan Gas Bumi Negara, 313 F.3d 70, 85 n. 15 (2d Cir.2002). The plaintiff there argued that “the law of the situs of the disputed property generally controls.” Id. We declined to apply this rule because “the New York Court of Appeals explicitly rejected the ‘traditional situs rule’ in favor of interest analysis in Istim.” Id. (citing Istim, Inc. v. Chemical Bank, 78 N.Y.2d 342, 346-47, 575 N.Y.S.2d 796, 581 N.E.2d 1042 (1991)). The interest analysis, which generally applies in all choice-of-law contexts, see Istim, 78 N.Y.2d at 347, 575 N.Y.S.2d 796, 581 N.E.2d 1042, begins with an examina *144 tion of the contacts each jurisdiction has with the event giving rise to the cause of action. See Karaha Bodas, 313 F.3d at 85. “Once these contacts are discovered and analyzed they will indicate (1) that there exists no true conflict of laws, ... as in most choice of law cases, or (2) that a true conflict exists, i.e., both jurisdictions have an interest in the application of their law.” In re Crichton’s Estate, 20 N.Y.2d at 135 n. 8, 281 N.Y.S.2d 811, 228 N.E.2d 799. “In property disputes, if a conflict is identified, New York choice of law rules require the application of an ‘interests analysis,’ in which ‘the law of the jurisdiction having the greatest interest in the litigation [is] applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.’ ” Karaha Bodas, 313 F.3d at 85.
The alternative basis for Judge Mish-ler’s holding in Elicofon provides a clear example of the application of the interest analysis. While the theft of the paintings occurred in Germany, he concluded correctly that the locus of the theft was simply not relevant to the interest underlying Ersitzung. Elicofon, 536 F.Supp. at 846. By contrast, “the contacts of the case with New York, i.e., Elicofon purchased and holds the paintings here, are indeed relevant to effecting its interest in regulating the transfer of title in personal property in a manner which best promotes its policy.” Id. Judge Mishler continued:
In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the theft took place, but simply whether one took place. Similarly, the residence of the true owner is not significant[,] for the New York policy is not to protect resident owners, but to protect owners generally as a means to preserve the integrity of transactions a'nd prevent the state from becoming a marketplace for stolen goods. In finding that New York law governs the question of title, we hold that Elicofon did not acquire title under Ersitzung.
Id. (emphasis added).
Judge Mishler’s analysis of the compelling New York interest to “preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods,” which preceded the clear articulation of this interest by the Court of Appeals in Lubell, is relevant here. However the Drawing came into the possession of the Swiss art gallery, New York has a compelling interest in the application of its law. Indeed, it has applied its own law in a case comparable to this one without pausing to engage in a choice-of-law analysis. See Menzel, 49 Misc.2d at 314-15, 267 N.Y.S.2d 804. Simply stated, if the claim of Vavra and Fischer is credited, a stolen piece of artwork was delivered in New York to a New York art gallery, which sold it in New York to Bakalar. Indeed, Baka-lar concedes that “a substantial part of the events or omissions giving rise to the claims herein” occurred in New York. (A-271.) These “events and omissions” made New York a “marketplace for stolen goods” and, more particularly, for stolen artwork, which was of special concern in Lubell. See 77 N.Y.2d at 320, 567 N.Y.S.2d 623, 569 N.E.2d 426.
By contrast, the resolution of an ownership dispute in the Drawing between parties who otherwise have no connection to Switzerland does not implicate any Swiss interest simply because the Drawing passed through there. While the Drawing was purchased in Switzerland by a Swiss art gallery, which resold it within five months to a New York art gallery, the application of New York law here would not have any adverse effect on the Swiss *145 art gallery. Nor would it affect any other Swiss citizen or Swiss interest. The application of New York law may cause New York purchasers of artwork to take greater care in assuring themselves of the legitimate provenance of their purchase. This, in turn, may adversely affect the extraterritorial sale of artwork by Swiss galleries. The tenuous interest of Switzerland created by these circumstances, however, must yield to the significantly greater interest of New York, as articulated in Lu-bell and Elicofon, in preventing the state from becoming a marketplace for stolen goods. Elicofon, 536 F.Supp. at 846, Lubell, 77 N.Y.2d at 320, 567 N.Y.S.2d 623, 569 N.E.2d 426. Thus, the Restatement (Second) of Conflict of Laws, which strongly tilts toward the situs rule, acknowledges that “[tjhere will also be occasions when the local law of some state other than that where the chattel was situated at the time of the conveyance should be applied because of the intensity of the interest of that state in having its local law applied to determine the particular issue.” Restatement (Second) of Conflict of Laws § 244 cmt. g (1971).
Greek Orthodox Patriarchate of Jerusalem v. Christie’s, Inc., 1999 WL 673347 (S.D.N.Y. Aug. 30, 1999), upon which the district judge and Bakalar rely, does not compel a different result. The issue in that case was whether New York or French law would apply to a stolen artifact over which a citizen of France acquired title based on prescriptive possession after thirty years, as permitted under French law. The artifact was ultimately brought to New York, where the auction house, Christie’s, Inc., auctioned it for $2 million. The Greek Orthodox Patriarchate of Jerusalem subsequently sued the purchaser and the prior French owner. The district judge granted summary judgment in favor of the defendants, on the ground that French law applied and on the ground of laches. The choice of law determination was based on the district judge’s erroneous application of the old situs rule. Moreover, she declined to apply the public policy exception to that rule after determining that “[t]he thirty-year period for prescriptive possession under French law, however, is a substantial length of time, not an indication of ‘commercial indifference.’ ” Id. at *5. We need not say here whether the application of French law was correct, although we can say the situs rule on which the district judge relied is not consistent with the New York choice-of-law rule, and that Swiss law and the commercial practice it fosters is significantly different than that of France.[3]
While we have focused on the laws of Switzerland and New York, there is a third jurisdiction, the laws of which are arguably relevant. The Drawing began its journey in Austria, and Austrian courts have recognized that Vavra and Fischer are the heirs to Grunbaum’s estate. Certainly, Austria has no interest in defeating the claim by these heirs against a United States citizen. Nevertheless, it is relevant that after World War II, Austria enacted a *146 statute known as the Austrian Nullification Act, which provided that “[a]ny paid and unpaid legal transactions and other legal business which occurred during the German occupation of Austria will be considered null and void if they were contracted as a consequence of any political or economic influence exercised by the German Reich in order to deprive individuals or entities of property assets or interests owned by or due them as of March 13, 1938.” NichtigkeitsG [Austrian Nullification Act] No. 106/1946, § 1 (Austria). The claims made on the basis of the Austrian Nullification Act were to be determined by subsequent legislation. While Austria enacted legislation relating to restitution of property from private parties — the Third Restitution Law BGB No. 54/1947, which the district judge observed imposed “a lesser burden for proving an illegitimate transfer of the Drawing in Austria,” (A~ 347) — -the statute expired on July 31, 1956. Nevertheless, an opinion of the Supreme Court of Austria, a translation of which is before us, declared that the Austrian Nullification Act is “in accordance with the immutable principles of our General Civil Code that nobody is obligated to adhere to a contract that was concluded on the basis of unfair and well-founded fear.” Oberster Gerichtshof [OGH] [Supreme Court] Apr. 1, 2008, Docket No. 5 Ob 272/07x (citing Austrian Civil Code § 870). Moreover, the Supreme Court of Austria observed that “[e]ven though claims for expropriation of property within the meaning of the [Third Restitution Law] can no longer be asserted due to expiration of the time limit (July 31, 1956), [these principles] contin-úen to be an integral part of Austrian law.” Id.
Although it is unclear whether a cause of action comparable to the counterclaims of Vavra and Fischer against Bakalar could be successfully brought in Austria, allowing the claims to go forward under New York law is consistent with the principles underlying the decision of the Supreme Court of Austria. While Austria may have allowed its restitution-enabling act to elapse eleven years after the end of WWII in order to protect Austrian citizens, the present ease does not involve a claim against any citizen of Austria.[4] Accordingly, we conclude that Austria has no competing interest in the circumstances presented here.
In sum, we conclude that the district judge erred in holding that Swiss law, rather than New York law, applied here. Consequently, if, contrary to the holding of the district judge, the Drawing was stolen or otherwise unlawfully taken from Grun-baum, that circumstance would affect the validity of Bakalar’s title.
Ill
Notwithstanding its conclusion that the manner in which the Drawing was *147 acquired from Grunbaum would not have affected the outcome of the case, the district judge found that the Grunbaum heirs had failed to produce “any concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum.” Bakalar v. Vavra, 2008 WL 4067335, at *8 (S.D.N.Y. Sept. 2, 2008). Our reading of the record suggests that there may be such evidence, and that the district judge, by applying Swiss Law, erred in placing the burden of proof on the Grunbaum heirs in this regard. Indeed, as discussed earlier, if the district judge determines that Vavra and Fischer have made a threshold showing that they have an arguable claim to the Drawing, New York law places the burden on Bakalar, the current possessor, to prove that the Drawing was not stolen. See Lubell, 77 N.Y.2d at 321, 567 N.Y.S.2d 623, 569 N.E.2d 426 (“[T]he burden of proving that the painting was not stolen property rests with the [possessor].”). Moreover, should the district judge conclude that the Grun-baum heirs are entitled to prevail on the issue of the validity of Bakalar’s title to the Drawing, the district judge should also address the issue of laches. This defense, which Bakalar raised in response to the counterclaim of the Grunbaum heirs, is one that New York law makes available to him.
Accordingly, for the reasons stated above, we vacate the judgment of the district court and remand the case for further proceedings, including, if necessary, a new trial.
IV
We turn briefly to the entirely collateral argument of the Grunbaum heirs that the district judge abused his discretion by limiting the discovery they sought for the purpose of filing a class action certification request. The order of the district judge directed non-parties Sotheby’s, Inc., Christie’s Inc., and Galerie St. Etienne, to provide “statistical information” necessary to address questions of class numerosity. Vavra and Fischer challenge the portion of the order excluding the identities of those who may have purchased works owned by Grunbaum. During a conference held on December 9, 2005, the district judge gave the following explanation for that limitation:
[G]iven the fact that this is a motion for class certification, what is important for the movant in that case, is to address the questions of numerosity. And the discovery that you are taking, you can, with the discovery that you are taking, that can be satisfied by providing you with statistics on the buyers and sellers of the Grunbaum works, and with the location by state or country at the time of the transaction, and whether the purchaser was a museum, an art dealer, or a private individual. There is no reason to learn the specific identities of those people at this time.
(A-65-66.) (emphasis added).
The order did not in any way prevent the Grunbaum heirs from obtaining discovery sufficient to satisfy the numerosity requirement or any other requirement of Fed.R.Civ.P. 23(a). Indeed, it suggested implicitly that such information could be obtained at some later point. Under these circumstances, the district judge did not abuse his discretion by denying defendants’ request for additional discovery. See Heerwagen v. Clear Channel Commc’ns, 435 F.3d 219, 233 (2d Cir.2006) (“The amount of [class] discovery is generally left to the trial court’s considerable discretion.”).
CONCLUSION
The judgment of the district court is VACATED and the case is REMANDED *148 for further proceedings consistent with this opinion.

. "Of particular significance is the ordinance dated April 26, 1938, which required Jews to register their assets and which covered both those who sought to leave the Reich [of which Austria was a part] and those who remained, with the Reich seeking to appropriate their domestically as well as their externally held assets.” Claims Resolution Tribunal: Deposited Assets Claims: Selected Laws, Regulations, and Ordinances Used by the Nazi Regime to Confiscate Jewish Assets Abroad, http://crt-ii.org/_nazi_laws/; see also Robert Gallately, Backing Hitler: Consent and Coercion in Nazi Germany 124 (2001); Otto D. Tolischus, Goering Starts Final Liquidation of Jewish Property in Gennany, N.Y. Times, Apr. 28, 1938, at 1.

. While the Nazis could simply have confiscated all of Grunbaum’s possessions without a power of attorney, the manner in which they proceeded here reflected their practice of camouflaging theft with a veneer of legality. Raul Hilberg, the preeminent historian of the Nazi war against the Jews, has written: "Lawyers were everywhere and their influence was pervasive. Again and again, there was a need for legal justifications.” Raul Hilberg, Perpetrators Victims Bystanders: The Jewish Catastrophe, 1933-1945, at 71 (1992). Indeed, the U.S. Consul General in Vienna at the time observed that "[t]here is a curious respect for legalistic formalities. The signature of the person despoiled is always obtained, even if the person in question has to be sent to Dachau in order to break down his resistance.” See Lynn H. Nicholas, The Rape of Europa: The Fate of Europe’s Treasures in the Third Reich and the Second World War 39, Chapter 2 n. 30 (First Vintage Books ed., 1994) (quoting NA, RG 59, SD Cable 862.4016/2103, Geist, Berlin, to Secretary of State, April 11, 1939); see also Gallately, supra note 1, at 124. Scholars have explained that respect for legalistic formalities was not a curious eccentricity. See, e.g., Henry Friedlander, Nazi Crimes and the German Law, in Nazi Crimes and the Law 16-17 (Nathan Stoltzfus & Henry Friedlander eds., 2008). Instead, "obedience to legal forms strengthened [the Reich's] power. Upstanding citizens felt a moral obligation to submit to the law's authority.... Resistance was immoral. If any citizens felt unease about a particular policy, their pained consciences were salved via display of a suitably stamped document in pursuance to a decree.” Richard Lawrence Miller, Nazi Justiz: Law of the Holocaust 1 (1995). In sum, the law "removed the question of the morality or legitimacy of the process.” Peter Hayes, Summary and Conclusions, in Confiscation of Jewish Property in Europe, 1933-1945: New Sources and Perspectives: Symposium 143, 147 (2003).

. According to Bakalar's expert, the Swiss Act on the International Transfer of Cultural Property ("CPTA”) extended the statute of limitations for the return of stolen or lost cultural objects of a certain importance from five years to thirty years. The Act, however, does not apply to events that occurred prior to its enactment in June 2005. More significantly, the Act is hardly clear regarding which objects come within the Act’s definition. Indeed, as Bakalar's expert opined, "[w]hether a cultural object is of importance in the sense of the CPTA is a question of interpretation, which must be answered on a case-by-case basis, taking into account the current opinion of art experts, the treatment of the object in scientific publications, etc. Objects of 'museum quality' are usually considered to be of importance in the sense of the Act.” (A-707 n. 11.)

. Significantly, the Republic of Austria continues to investigate all works of art acquired between 1938-1945, which are now owned by it. Indeed, as the Austrian Embassy in the United States observed, "[w]orks of art not properly obtained will be returned to their original owners or their heirs.” Austrian Press and Information Service, Austrian Holocaust Restitution, http://www.austria.org/ content/view/414/1. Indeed, the International Bar Association recently reported that "The Austrian 'Commission for Provenance Research’ issued 11 recommendations, recommending the transfer of the disputed objects (including paintings, prints, sculpture, ethno-graphical objects and musical instruments) to the heirs of the initial owners in ten cases, and in part in one case.” Sarah Theurich, International Bar Association, Art, Cultural Institutions and Heritage Law August 2009, http://www.ibanet.org/Article/Detail.aspx? ArlicleUid=C93CF2FA-F5F6-4A64-A7D1-8BD907FDF3DD; see also Holocaust Claims Processing Office, Eight Artworks Returned to Rightful Heir From Austrian Museums with [Assistance] of Holocaust Claims Processing Office, http://www.claims.state.ny.us/pr 081002.htm.