Amedeo Angiolillo, Renato Angiolillo, Luigi Angiolillo, Olga Angiolillo, Patrizia Angiolillo, Plaintiffs,

against
Christie's, Inc., Diamfield, LTD., a British Virgin Islands Company, Herve Fontaine, Pelham Holdings, LLC, Guy Bennett, Investel Finance, LTD, Ishaia Trading Corp, Ishaia Gol, David Gol, Defendants.


650871/2015

Plaintiffs 
Edward Kelly, Tiajoloff & Kelly
405 Lexington Ave, 37th Floor, New York NY 10174
212-490-3285
Defendants
Christie's 
Daniel H. Weiner, Hughes Hubbard & Reed LLP
1 Battery Park Plaza, New York NY 10004
212-837-6000
Investel Finance, Ltd, Ishaia Trading Corp., David Gol, and Ishaia Gol
Emily Reisman, Clarick Gueron Reisbaum LLP
220 5th Avenue, 14th Floor, New York NY 10001
212-633-4311
Pelham Holdings, LLC and Guy Bennett
Catherine A. Williams, Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas, New York NY 10036
212-336-2207


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 011) 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 470, 471 were read on this motion to/for SUMMARY JUDGMENT (AFTER JOINDER)
The following e-filed documents, listed by NYSCEF document number (Motion 012) 352, 353, 354, 355, 356, 357, 358, 433, 436, 437, 438, 439, 440, 441, 442, 443 were read on this motion to/for SEAL
The following e-filed documents, listed by NYSCEF document number (Motion 013) 347, 348, 349, 350, 351, 426, 427, 428, 429, 430, 431, 432, 434 were read on this motion to/for AMEND CAPTION/PLEADINGS
The following e-filed documents, listed by NYSCEF document number (Motion 014) 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 472, 473, 474, 475, 476, 477, 478, 480 were read on this motion to/for DISCOVERY
The following e-filed documents, listed by NYSCEF document number (Motion 015) 481, 482, 483, 484, 485, 486, 487 were read on this motion to/for SANCTIONS
This case involves the storied Princie Diamond—an extremely rare and valuable 34.65 carat pink diamond quarried from the legendary Golconda mines of India (the Princie Diamond)—auctioned by Christie's in 2013 for over $39 million. Five motions are before the court (Motion Seq. Nos. 011-015).
The Plaintiffs now move pursuant to CPLR § 3212 (Motion Seq. No. 0 11) for partial summary judgment requesting the court to (1) find that the Princie Diamond belonged to Senator Renato Angiolillo and (2) and dismissing the Gol Defendants' (hereinafter defined) affirmative defense that they acquired good title under Swiss law on the ground that New York and not Swiss law applies to a 2010 sale of the Princie Diamond to Investel Finance Ltd. The defendants, collectively, cross-move pursuant to CPLR § 3212 for summary judgment and dismissal. Christie's, Inc., Pelham Holdings LLC, and Guy Bennett jointly move (Motion Seq. No. 12) for an order sealing (1) certain information related to their clients who are not parties to this action, and (2) confidential information contained in various agreements and communications between Christie's and its clients containing sensitive financial and operational information. Christie's also moves pursuant to CPLR § 3025 (Motion Seq. No. 13) for leave to file a second amended answer to the third amended complaint.
The Plaintiffs have also filed (1) a discovery motion (Motion Seq. No. 14) seeking to have the court compel Christie's to produce certain documents which have heretofore been withheld from production by Christie's, which claims that those documents are protected under the attorney-client privilege and/or the work-product privilege, and (2) a motion seeking sanctions (Motion Seq. No. 15) and striking certain portions of the defendants' joint reply brief because it allegedly contains "false and disparaging personal attacks upon Plaintiffs and their counsel."
The critical issue in this case is whether the holdings of Bakalar v Vavra, 619 F3d 136 [2d Cir 2010] and Reif v Nagy (61 Misc 3d 319, 323 [Sup Ct NY County 2018]) requiring the application of New York and not Swiss law are limited to Holocaust art recovery cases or [*2]whether the choice of law analysis also applies to other art, jewelry and artifacts cases involving suspect provenance. This Court holds that the holdings of those cases are not so limited and New York law applies. For the reasons set forth below, (1) the motion for summary judgment (Motion Seq. No. 11) is denied and the cross motion is granted only with respect to the replevin cause of action, that cause of action is dismissed and the cross motion is otherwise denied; (2) the motion to seal (Motion Seq. No. 12) is denied; (3) the motion for leave to file a second amended answer (Motion Seq. No. 13) is denied; (4) the motion to compel production (Motion Seq. No. 014) is granted; and (5) the motion for sanctions (Motion Seq. No. 15) is denied.
THE RELEVANT FACTS AND CIRCUMSTANCES
Amedeo Angiolillo, Renato Angiolillo, Luigi Angiolillo, Olga Angiolillo and Patrizia Angiolillo (collectively, the Plaintiffs) are the heirs of the late Italian Senator Renato Angiolillo (the Senator), who allegedly purchased the Princie Diamond from Van Cleef & Arpels in 1960 (Third Amended Complaint [the Complaint], ¶ 33). As evidence of the Senator's ownership, the Plaintiffs rely on an insurance policy obtained in 1973, which identifies as an item of scheduled jewelry a 34 carat pink diamond and certain other valuable jewelry, including a pair of 60 carat Van Cleef & Arpels earrings, a Van Cleef & Arpels necklace with cabochon rubies, a 40 carat sapphire Gerard ring, and a 44.65 carat Harry Winston sapphire ring (such other valuable jewelry, collectively, hereinafter, the Other Valuable Jewelry) (Complaint, ¶ 38; Ex. B [copy of insurance policy]; also Kelly Affirm., Exs. 13-14). The Plaintiffs maintain that the Princie Diamond remained in the Senator's "ownership and possession" until his death in Italy in August of 1973 (Complaint, ¶ 39). They claim that upon his death, title to the Princie Diamond and the Other Valuable Jewelry transferred pursuant to the Italian Civil Code in effect in 1973, which regulated the inheritance laws, to the surviving children of the Senator, namely, Mario Angiolillo and Giuseppe Gaetano Angiolillo (both now deceased) and Plaintiff Amedeo Angiolillo (id., ¶ 40). The Plaintiffs claim that they are the rightful owners of the Princie Diamond either because (x) they are a direct descendant of the Senator or (y) because they are the sole surviving heirs of his descendants (i.e., his grandchildren, Renato, Luigi, Olga, and Patrizia) (id.).
In his last will and testament, as confirmed in a document entitled "Declaration in Lieu of Notary-Drawn Affidavit" executed February 7, 1974 (the Senator's Will), the Senator only bequeathed to his second wife, Maria Girani Angiolillo, his villa in Rampa Mignanelli, located at the famous Spanish Steps in Rome, Italy, along with all its highly valuable furniture (id., ¶ 41). Pursuant to the then-applicable Italian law, Ms. Angiolillo, as the surviving spouse, was granted an uxorial usufruct of one third of the Senator's entire estate (apart from the villa and its furniture, which she inherited outright under the Senator's Will). Accordingly, she had the right to legal possession and use, but not ownership, of the Princie Diamond and the Other Valuable Jewelry for the remainder of her life. Ms. Angiolillo died intestate in Rome on October 14, 2009 (id., ¶ 46).
Following Ms. Angiolillo's death, Amedeo Angiolillo attempted to contact her son, Marco Oreste Bianchi Milella, for the return of the Princie Diamond and the Other Valuable Jewelry (id., ¶¶ 47-48). After initial attempts to contact Mr. Milella proved fruitless, Renato Angiolillo, Jr. (Giuseppe Gaetano Angiolillo's son) contacted an attorney to formally ask Mr. Milella to return the Princie Diamond and Other Valuable Jewelry that were previously in Ms. Angiolillo's custody (id., ¶ 48). In a letter dated January 4, 2010, Mr. Milella's attorney, Edoardo Disetti, responded that,
My client has informed me that he is unaware of the existence of the assets of the type [*3]that you have indicated, nor is he obviously in possession of such assets (id., Ex. C).
Subsequently, the Plaintiffs requested the Italian authorities to initiate a criminal investigation of the missing Princie Diamond and the Other Valuable Jewelry. In February of 2012, Mr. Milella contacted the Italian District Attorney conducting the criminal investigation of the Princie Diamond in Campobasso, reiterating that he was unaware of the existence of the Princie Diamond or the Other Valuable Jewelry. Specifically, in a fax dated February 17, 2012, Mr. Milella stated:
With regard to the subject matter jewels, I point out that I have no knowledge of which assets they may be, nor have I ever known for what reason my mother possessed jewels or what was their provenance. Indeed to my knowledge, they could be assets which she received in usufruct (although such a circumstance is in my view frankly unrealistic), so that she could wear them at the events she organized, for which she was famous, to be returned immediately thereafter.
* * *
I can report with certainty that on my visits to my mother, visits which in any event were sporadic due to my business commitments, and also to the fact that I have always lived far from Rome, I was never able to see said jewels at her home, and she never spoke of them with me. In addition, I want to point out that since boyhood I had never lived with my mother.
* * *
In addition, those assets were not found at the residence of my mother, even after her death; when probate proceedings began, the only assets which came into my possession, in turn, as sole heir were her wardrobe (given to third parties for charity), a few chattels of little value (which I later gave to women friends of my mother's) and some cash (a few thousand Euros) held in the single bank account in her name (Complaint, Ex. D).
To be clear, Mr. Milella unequivocally denied having possession of the Princie Diamond or the Other Valuable Jewelry:
no jewel belonging to my mother was ever made available to me, either when she was alive or after her death . (id.).
However, when the Italian authorities executed a search warrant on March 28, 2013 (the March 2013 Search Warrant) of the homes of Mr. Milella, Mr. Milella's girlfriend and Herve Fontaine, a gems dealer who resided in Monaco, certain of the Other Valuable Jewelry were recovered (id., ¶ 53). At the time of recovery, Mr. Milella's girlfriend claimed that the Van Cleef & Arpels necklace and earrings were given to her as a gift by Mr. Milella (id). Wiretaps obtained in the Italian criminal investigation further support the fact that Mr. Milella gave his girlfriend the Van Cleef & Arpels necklace which was part of the Other Valuable Jewelry (id., ¶ 54; id., Ex. E). Ultimately, Mr. Milella admitted in an Italian criminal proceeding that he took the Other Valuable Jewelry and the Princie Diamond, but then claimed that he
inherited the jewels legitimately [f]rom my mother, Maria Angiolillo, who has inherited them from her husband Renato Angiolillo (Kelly Affirm., Ex. 27).
Shortly after Ms. Angiolillo's death, Herve Fontaine [FN1]
informed David Gol, another gems [*4]dealer, that he could get the Princie Diamond on consignment for him (Statement of Undisputed Material Facts [SUMF], ¶ 39). Within two weeks of Ms. Angiolillo's death, the Princie Diamond was transported from Italy to Switzerland on consignment to Gidish SA — a Swiss company owned by David Gol — where it stayed less than 24 hours before being sent to New York on consignment to Ishaia Trading Corp. (Ishaia Trading), a New York corporation owned by Ishaia Gol, David Gol's brother that buys and sells high-end jewelry (SUMF, ¶¶ 41, 42). The day after the Princie Diamond arrived in New York, Ishaia Trading consigned and transported the stone to Christie's in New York (SUMF, ¶ 43).
The Plaintiffs allege that Rahul Kadakia, the head of Christie's jewelry department in New York, attempted a "private sale" of the Princie Diamond and it is admitted by Christie's that it was trying to sell the Princie Diamond on a "client by client" basis starting in 2010 (SUMF, ¶ 49). Christie's testified, through Mr. Kadakia, that it already had authority to sell the Princie Diamond in early 2010 (SUMF, ¶ 48; Kelly Affirm., Ex. 8, pp. 91-92, 95). Throughout August and September of 2010, Christie's continued its attempts to privately sell the Princie Diamond (SUMF, ¶ 55).
On October 8, 2010, while Christie's continued its efforts to sell the Princie Diamond, Investel Finance Ltd. (Investel; Investel, together with Ishaia Gol, David Gol, and Ishaia Trading, hereinafter, collectively the Gol Defendants), a BVI corporation owned by David Gol, purchased the Princie Diamond from Mr. Milella by wiring $19,200,27.86 from a bank account in Monaco to the Swiss bank account of Mr. Milella (the 2010 Transaction) (id., ¶ 60). David Gol testified that he was willing to pay that much for the Princie Diamond because he was advised by Mr. Kadakia (of Christie's) that this was "a historical stone"—a fact which was not known to others at the time—and because he "thought if that stone is a historical stone, [Mr. Kadakia] may [ ] get rid of it for me" (i.e., at auction) (Kelly Affirm., Ex. 7, D. Gol Dep., p. 120). The 2010 Transaction was allegedly consummated pursuant to an agreement dated September 29, 2010, between Mr. Milella and "Diamfeld Limited, represented by Mr. Herve Fontaine" (the September 29, 2010 Agreement). Although Investel is not a party to the September 29, 2010 Agreement, Mr. Fontaine testified that the September 29, 2010 Agreement was drafted to reflect the terms of the purchase agreed upon between Mr. Milella and Investel, with Mr. Fontaine acting as an intermediary/broker in the purchase (Reisbaum Aff., Ex. 9, Fontaine Dep., pp. 114-25). The September 29, 2010 Agreement represents that Mr. Milella:
received the subject stone from his mother, Mrs. Maria Angiolillo, having herself acquired it thanks to her husband in 1960 from the Van Cleef and Arpels jewelers" (Kelly Affirm., Ex. 5).
It is undisputed that the Senator was Ms. Angiolillo's husband in 1960.
Shortly after the September 29, 2010 Agreement was executed, pursuant to a separate agreement, dated October 11, 2010, Investel consigned the Princie Diamond to Christie's for $40 million (Kelly Affirm., Ex. 12). Counsel for the Gol Defendants has represented that on October 15, 2010, the Princie Diamond was being held at the Geneva Freeport, a temporary storage facility, and was then sent to Christie's in New York (SUMF, ¶ 78). The Princie Diamond was in New York from sometime in October 2010 until mid-January 2011 (id., ¶ 79).
Thereafter, pursuant to a certain "Seller's agreement including minimum price guarantee" [*5](the Seller's Agreement), dated January 25, 2011, between Investel and Christie's, Investel designated Christie's as the exclusive seller of the Princie Diamond (id., ¶ 80; Kelly Affirm., Ex. 18). The Seller's Agreement provided that, "[w]ith respect to this agreement and any rights arising outside this agreement shall be governed by the laws of the state of New York" (id., Ex. 18, § 19[h]).
In 2013, after approximately three years of attempting to sell the diamond privately without success, Christie's began negotiations on a guaranteed minimum bid for the auction of the Princie Diamond with Pelham Holdings, LLC (Pelham), a New York company controlled by defendant Guy Bennett and acting as an agent on behalf of Sheikh Jassim Bin Abdulazziz Al Thani (Sheik Jassim), who is a member of the royal family of Qatar (SUMF, ¶108). The Plaintiffs allege that in an effort to secure a guaranteed minimum bid at auction, Christie's presented the Princie Diamond to Sheik Jassim at the Qatari royal family's residence in New York (id., ¶ 109).
Ultimately, pursuant to a certain letter agreement (the Minimum Bid Agreement), dated February 28, 2013, between Christie's and Guy Bennett/Pelham on behalf of Sheikh Jassim, the parties agreed to a guaranteed minimum bid and designated New York law to govern (id., ¶ 108; Kelly Affirm., Ex. 18). The obligation to pay the minimum bid was supported by a promissory note in the amount of such minimum bid. By agreement (the Auction Agreement), dated February 28, 2013, Investel entered into a contract with Christie's for the auction of the Princie Diamond, which Auction Agreement also provided that it was governed by New York law (Kelly Affirm., Ex. 17).
The first time that Christie's appears to have investigated the provenance of the Princie Diamond is in March of 2013, when Christie's sent an email, dated March 4, 2013, to Ishaia Gol requesting that David and Ishaia Gol provide all proof of ownership for the Diamond (SUMF, ¶ 112). Around that same time, and prior to any communications with the Plaintiffs, Christie's learned of Italian news articles regarding the investigation of Mr. Milella (id., ¶ 113). Christie's did not contact the Plaintiffs or any of the Italian authorities for additional information but claims that it hired counsel in "multiple jurisdictions" to conduct an investigation into the rightful ownership of the Princie Diamond (id., ¶ 116). The results of Christie's investigation have been withheld by Christie's based upon the attorney-client privilege, as further discussed below (see Motion Sequence No. 14 discussion, infra).
Hours before the auction, Christie's sent an amendment to the Auction Agreement to Investel, which permitted Christie's to keep the proceeds from the sale of the Princie Diamond in escrow after the auction because of the "controversy" (further discussed below) with Messrs. Amedeo Angiolillo and Renato Angiolillo, Jr., which amendment was executed by Investel.
As discussed in more detail below, the Plaintiffs were not aware of the location of the Princie Diamond until shortly before its auction in April 2013. Upon learning of the April 16, 2013 scheduled auction, Mr. Amedeo Angiolillo's attorney Eugenio Minoli, Esq., contacted Christie's by letter, dated April 8, 2013 (the April 8, 2013 letter) and advised Christie's that there was "a great likelihood, almost a certainty" that the diamond scheduled to be auctioned by Christie's was the missing Princie Diamond owned by the heirs of the late Senator (Complaint, ¶ 58; id., Ex. F). Mr. Minoli also advised Christie's that the Italian criminal authorities were investigating the missing Princie Diamond and the disappearance of the Other Valuable Jewelry (id.). Furthermore, Mr. Minoli informed Christie's that, pursuant to the execution of the March 2013 Search Warrant, certain items of the Other Valuable Jewelry were recovered from the [*6]home of Mr. Milella's girlfriend (id.). The April 8, 2013 letter also requested that Christie's investigate "the provenance of 'The Princie Diamond'" and determine "the proper title of seller" (id.). Separately, Renato Angiolillo Jr.'s attorney also contacted Christie's in Italy by letter, dated April 8, 2013 (the April 8th Letter), to advise Christie's of Renato Angiolillo's claim of ownership in and to the Princie Diamond and of the pending criminal proceeding in Italy. Additional notice was also provided to Christie's of the issues surrounding title to the Princie Diamond in that, by letter, dated April 10, 2013, the Prosecutor's Office of Campobasso, Italy, which was conducting the criminal investigation into the theft of the Princie Diamond and the Other Valuable Jewelry, also sent a formal notice to Christie's informing Christie's of the pending criminal investigation of Messrs. Milella and Fontaine (id., ¶ 60; id., Ex. G). In response to the April 8th Letter, Christie's, by its counsel at Skadden, Arps, Slate, Meagher & Flom, sent a letter, dated April 10, 2013 (the April 10th Letter), (i) confirming that the diamond it was going to auction was the same rare, 34.65 carat pink diamond previously held by Ms. Angiolillo (id., Ex. H), (ii) that it was not relevant because Christie's had satisfied itself that the consignor had good title to the Princie Diamond and (iii) threatening that if the Plaintiffs were to seek injunctive relief that Christie's would oppose any such motion and demand that a cash bond of at least $20 million be deposited in support of any such injunctive relief. To wit, the April 10th Letter provided:
• The current owner of the Princie Diamond (the "Consignor") is a corporation whose owners are not Italian nationals and are not affiliated with any branch of the family of Senator Angiolillo, including, for the avoidance of doubt, Mrs. Girani Angiolillo or Mr. Bianchi Milella.
• During much of her lifetime, Mrs. Girani Angiolillo held herself out as the 100% beneficial owner of the Princie Diamond, apparently on the basis that she acquired it in 1960 (the year she married Senator Angiolillo). As from 2009, Mr. Bianchi Milella likewise held himself out as the 100% beneficial owner of the Princie Diamond.
• Some years ago, in reliance on these representations, the Consignor purchased the Princie Diamond through a broker for a significant price, totaling over US$20 million (emphasis in original). Accordingly, under Swiss law, which governed the transaction (the Princie Diamond was in Switzerland at the time of the sale), the Consignor acquired full title and ownership of the Princie Diamond—including the right to consign the Princie Diamond to Christie's for auction [citing Swiss Civil Code, Art. 714(2) ("[a] person who in good faith receives possession of a chattel as owner will become its owner even if the transferor is not authorized to alienate it as soon as his or her possession is protected according to the provisions governing possession") and Art. 933 ("The good faith purchaser to which full or limited title on a movable has been transferred by someone entrusted with such movable must be maintained in his/her acquisition even if the seller had no authority to make such a transfer")] . . .
Christie's is therefore fully satisfied as to the Consignor's unequivocal good title to the Princie Diamond (id., p. 2).
The April 10th Letter further advised that:
1. Any attempt to impede the forthcoming auction of the Princie Diamond will be opposed by Christie's, which will take all necessary action to protect its own business rights from interference and to oppose any claims by your client.
2. If the auction is threatened, Christie's may pursue claims (or counterclaims, as the case [*7]may be) against your client for damages and/or injunctive relief for tortious interference and other causes of action available to Christie's to protect its business rights.
3. Christie's further advises that the value of the Princie Diamond is in excess of US$20 million and that, in the event any injunctive relief pertaining to the Princie Diamond is sought (including any attempt to enjoin its upcoming auction), Christie's will not only oppose such an injunction on the merits, but will also seek that the court require deposit by your client of a cash bond in at least that sum (id., p. 3).
Subsequently, on April 11, 2013, Christie's offered to provide information on its then-unidentified consignor in exchange for Messrs. Amedeo and Renato Angiolillo's release of all claims against Christie's and the consignor (id., ¶ 71). This offer was, of course, rejected (id.).
Subsequently, Christie's then issued another letter, dated April 12, 2013 (the April 12, 2013 Letter) threatening a lawsuit against Messrs. Amedeo and Renato Angiolillo, and Mr. Renato Angiolillo's attorney, Luigi Iosa, based on certain statements allegedly made by them to the Italian press regarding the Princie Diamond (id., Ex. I). The April 12, 2013 letter also requested that Messrs. Amedeo and Renato Angiolillo release their claims against Christie's and its consignor, which the Plaintiffs declined to do (id.). Four days later, on April 16, 2013, Christie's, at their 20 Rockefeller Plaza location, auctioned the Princie Diamond. The winning bid was $39,322,750 (id., ¶¶ 74-75).
The Italian criminal proceedings against Messrs. Milella and Fontaine concluded in January 2018. In a written decision, dated January 17, 2018 (the Criminal Court Decision), the Italian court dismissed the claims against Mr. Milella as barred by the statute of limitations.[FN2]
The Italian court declined to issue "a wider and more favorable decision on the merits" with respect to Mr. Milella "due to the largely conflicting evidence that was admitted that makes not possible with a simple acknowledgement activity, to establish the total absence of the evidence of guilt for [Mr. Milella], or the positive evidence of his innocence" (id., p. 10). The court concluded that based on "the conflicting circumstances emerging from the trial, it is deemed appropriate to maintain the seizure of the earrings and of the necklace and to remit to the civil court judge the resolution of the dispute on their ownership" (id., p. 11).
As concerns Herve Fontaine, however, the court cleared him of any wrongdoing, determining that "Fontaine acted in a way that is far from being suspicious" because he was reasonable in his belief that Ms. Angiolillo owned the jewelry at issue and that Mr. Milella lawfully inherited the jewelry from her upon her death (id., p. 13). In this regard, the Court wrote:
In particular, Fontaine was totally convinced that Mrs. Girani was the owner of the jewels, considering that he has been knowing her since 1977, and also her son, being on friendly terms with her and having seen — for thirty years — her wearing the jewels that are under dispute.
* * *
. . . since the beginning Fontaine acted in a way that is far from being suspicious [as customs procedures were carried out by him and] The declaration to customs of jewels having criminal origin does not seem to be an activity consistent with the conduct of a [*8]receiver of stolen goods.
Another element, that leads the judge to exclude the existence of the crime under dispute, is the entering into a sale contract for the pink diamond that, as explained by Fontaine, considering the relevance of asset was prepared by an attorney in Geneva who was expert in jewels: a fact that is not in line with the conduct of a receiver of stolen goods.
Also the payments of all the jewels—including the pink diamond—were made in favor of Bianchi Milella by transfer to a bank in Lugano, that was the same used in 2008 to send—by bank transfer—the money for the sale of the emerald ring [sold by Maria Girani during her lifetime), hence absolutely traceable (id., pp. 13-14).
In other words, Mr. Fontaine was cleared of criminal liability because of certain circumstantial evidence, including his payment to Mr. Milella, which the court concluded made it appear as though he did not act as someone who had knowingly accepted and dealt in stolen goods.
The Plaintiffs brought this lawsuit alleging (i) Conversion (first cause of action), Replevin (second cause of action), Negligence and/or Gross Negligence (third cause of action), and Unjust Enrichment (fourth cause of action) as against Christie's, (ii) Conversion (fifth cause of action) against Diamfeld and Herve Fontaine (now dismissed for lack of personal jurisdiction as per below), (iii) Conversion (sixth cause of action) as against the Gol Defendants, and (iv) Conversion (seventh cause of action) as against Pelham and Guy Bennett. Christie's previously asserted a counterclaim against the Plaintiffs denominated "Intentional Interference with Contractual Relations," which this court (Ramos, J.) dismissed with prejudice in a decision issued on the record on January 5, 2016 (Tr., NYSCEF Doc. No. 485).
DISCUSSION
I. Motion and Cross-Motion for Summary Judgment (Mtn . Seq. No. 11) Denied Except with Respect to the Claim for Replevin Which is Dismissed
Summary judgment should be granted when the movant presents evidentiary proof in admissible form that there are no triable issues of material fact and that there is either no defense to the cause of action or that the cause of action or defense has no merit (CPLR § 3212[b]). The burden is initially on the movant to make a prima facie showing of entitlement to judgment as a matter of law tendering sufficient evidence in admissible form to demonstrate the absence of any material fact (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Failure to make such a prima facie showing requires denial of the motion (id., citing Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]). Once the showing has been made, the burden of going forward with the proof shifts to the opposing party to produce evidence in admissible form sufficient to establish the existence of a material issue of fact, which requires a trial (Alvarez, 68 NY2d at 324, citing Zuckerman v City of New York, 49 NY2d 557, 562 [1980]).
With respect to that aspect of the Plaintiffs' motion seeking an order that the Senator owned the Princie Diamond, factual issues exist that preclude the Court from issuing such a declaration. The insurance policy, dated March 16, 1973, upon which the Plaintiffs rely, is not conclusive proof of the Senator's ownership of the Princie Diamond (Kelly Affirm., Ex. 13). That policy, entitled "Jewelry All Risks Policy No. 9.008.775" names the "Senator and Mrs. Renato Angiolillo" as the Insured, and provides that it is "intended to cover the jewels and fur coats in the course of travel effectuated by Mrs. Angiolillo in the U.S.A. in the period from October 24, 1972 to and including November 24, 1972." The cover notice attached to the policy addressed to the Senator refers to the insured property as the "jewelry and fur coats of your [*9]esteemed spouse" (id.). Another policy entitled "Lloyd's Policy," dated December 21, 1970, lists just the Senator, without Ms. Angiolillo, and includes an endorsement listing "one pink diamond ring 34 carats, Van Cleef & Arpels" (Kelly Affirm., Ex. 14). Although this second policy only names the Senator as the insured, in the face of the other contradictory evidence it simply is not sufficient to establish that there are no triable issues of fact that the Senator owned the Princie Diamond.
The Princie Diamond is also not listed in the Senator's Will. The Defendants argue that because the Senator's Will does not expressly mention the Princie Diamond or any of the Other Valuable Jewelry, it follows that the Plaintiffs could not have inherited the Princie Diamond. This , however, is not dispositive. The Senator's Will did not list many of the items that devolved to his heirs by law, including but not limited to, e.g., jewelry, apartments, land, and shares in his newspaper Il Tempo (see Kelly Affirm., Ex. 24). To the extent that the Senator's Will named specific assets and sought to clarify the assets that belonged to Ms. Angiolillo either because the Senator bequeathed such assets to her or because she obtained the items on her own, this was required under Italian law. Indeed, the Senator's Will references a letter that he had signed, allegedly in 1961, which carefully catalogued and identified certain property that belonged to Ms. Angiolillo (Kelly Supp. Affirm., Ex. 32). The Princie Diamond is not included in that letter. Based on the record here, the Court cannot decide as a matter of law that the failure to specifically reference the Princie Diamond in the Senator's Will means either that the Princie Diamond was a part of the Senator's estate and passed to the Plaintiffs or that it belonged to Ms. Angiolillo.
Likewise, the remainder of the "proof" cited by both sides is insufficient to entitle either side to summary judgment. Both sides rely on contradictory third-party testimony that supports their theory of the case. For the avoidance of doubt, certain letters written periodically by Gaetano Angiolillo to Ms. Angiolillo from 1975 to 1991 (and relied upon by the defendants) concerning the "fate of the family jewels" as evidence of Ms. Angiolillo's ownership are inconclusive and are not dispositive evidence of Ms. Angiolillo's hostility to the Plaintiffs' claim of ownership, as the defendants suggest.
Finally, relying primarily on Mahoney-Buntzman v Buntzman (12 NY3d 415, 422 [2009]), the defendants argue that based on the tax positions previously taken by the Plaintiffs, they are precluded from claiming ownership of the Princie Diamond. Mahoney-Buntzman involved a matrimonial dispute where the court precluded the defendant-husband who had previously reported $1.8 million as "business income" under penalties of perjury on his U.S. tax return, so as to be able to take a favorable tax position, from then claiming in the context of a divorce proceeding that such $1.8 million was from the sale of stock that he owned in his prior marriage so as to avoid having the same property being deemed "marital property" subject to equitable distribution (id.). Based on this case, the defendants argue that in the five years following the Senator's death, his heirs filed seven different tax declarations with the Italian tax authorities, none of which mention the Princie Diamond (Defs. SUMF, ¶¶ 204, and 205-07). In 1973, the year the Senator died, Italian law had a clear-cut mechanism for valuing the jewelry, art, cash and other "movables" in an estate. The law presumed that an estate contained assorted "movables" (e.g., jewelry cash, and art) worth 10 % of the total value of the rest of the estate (id., ¶ 202). Estates with movable goods worth more than 10 % of the total estate value were not entitled to this presumption and the law required the heirs to such estates to expressly account for, declare and pay taxes on the actual value of the property (id.). The Senator's heirs did not [*10]pay more than the 10 % of the total estate's value—i.e., the presumed amount. Thus, the defendants argue that by their own declarations, the Senator's heirs did not inherit the Princie Diamond. The argument however is unavailing as Mahoney-Buntzman is simply inapplicable to the case at nisi prius. This is not a divorce proceeding where a party is trying to avoid having certain property deemed marital property where previously they had characterized such property in such a manner as to gain a favorable tax advantage. Simply put, the fact that the Plaintiffs never paid taxes on the Princie Diamond when they allegedly inherited it is not dispositive evidence of their non-inheritance nor is it necessarily a bar to their ownership, as the defendants suggest. Matter of Seaman (275 AD 484 [3d Dept 1949]) is instructive. At issue was the construction of the decedent's will and whether a collection of valuable china was owned by the decedent or the appellant, the decedent's second wife. The decedent had bequeathed property to his second wife to be used during her lifetime, which upon her death would be passed down to his sons (id.). The Appellate Division found, and the Court of Appeals affirmed (300 NY 756), that the appellant was not estopped from claiming ownership of the china even though the Surrogate's Court had found that the china had been included in the assets of the decedent's estate in a prior tax proceeding, and in prior accountings of the executors and trustees. The Court held that although the appellant was a party to the prior proceedings and was bound by decrees made therein, "nowhere was the court asked to pass upon the question of ownership" (id.). Here, the failure to pay taxes does not require a holding of estoppel, and, in any event, there is no evidence submitted that either Ms. Angiolillo (or Mr. Milella) paid any taxes on the Princie Diamond as an inheritance.
In other words, given all of the contradictory evidence submitted by the parties, the questions surrounding the ownership of the Princie Diamond necessarily cannot be resolved by summary judgment but must be instead be answered by the trier of fact.
In their opposition papers and cross motion, the defendants also argue that even if the Princie Diamond did not belong to Ms. Angiolillo and she merely possessed an uxorial usufruct, under Swiss law, which the defendants argue applies, Investel nonetheless obtained good title to the Princie Diamond from Mr. Milella notwithstanding the unlawful conversion. To wit, the defendants maintain that Swiss law applies because some of the individual defendants are Swiss citizens and because they contend that the Princie Diamond was in Switzerland at the time that Mr. Milella sold it to Investel. In this regard, the defendants urge the Court to adopt a "situs rule" that has been rejected in New York (Bakalar v Vavra, 619 F3d 136 [2d Cir 2010] [rejecting district court's application of abolished situs rule]; Istim, Inc. v Chemical Bank, 78 NY2d 342, 346-47 [1991]). At oral argument, the defendants clarified that they are not relying on the "situs rule" but that Swiss law applies because the conflicting laws here are conduct-regulating and that where the relevant law is conduct regulating, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greater interest in regulating behavior within its borders (citing a worker's compensation case, Cooney v Osgood Mach. Inc., 81 NY2d 66, 72 [1993]). The argument still fails.
The first step under New York's choice of law analysis is to determine whether there is an actual conflict between the laws of the two jurisdictions involved (In re Allstate Ins. Co. and Solarz, 81 NY2d 219, 223 [1993]). Courts will not engage in a choice of law analysis in the absence of an actual conflict. "In property disputes, if a conflict is identified, New York choice of law rules require the application of an interests analysis, in which the law of the jurisdiction having the greatest interest in the litigation is applied and the facts or contacts which obtain [*11]significance in defining State interests are those which related to the purpose of the particular law in conflict" (Bakalar v Vavra, 619 F3d 136, 144 [2d Cir 2010]).
Here, there is well-recognized conflict between New York and Swiss law with respect to the issue of title (e.g., Bakalar v Vavra, 619 F3d 136 [2d Cir 2010]). It is well-settled that under New York law, "a thief cannot pass good title" (id. at 140). "New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in possession of a good-faith purchaser for value" (Solomon R. Guggenheim Found. v Lubell, 77 NY2d 311, 317 [1991]). This reflects "an overarching concern that New York not become a marketplace for stolen goods and, in particular, for stolen artwork" (Bakalar, at 141). The burden of proving title under New York law rests with the possessor (Lubell, 77 NY2d at 321). Under Swiss law, however, a bona fide purchaser becomes the owner even if the chattel was stolen or otherwise transferred without the authorization of its owner (Schoepps v Museum of Modern Art, 594 F Supp2d 461, 467 [SD NY 2009]). Under Art. 934 of the Swiss Civil Code, a good faith purchaser will acquire valid title to stolen property after a period of five years (Bakalar, 618 F3d at 140). After the five-year period, a previous owner of a stolen object can no longer seek the return of the object from a good faith possessor, and, critically, Swiss law "also presumes that a purchaser acts in good faith, and a plaintiff seeking to reclaim stolen property has the burden of establishing that a purchaser did not act in good faith" (id.).
Relying on Bakalar, supra, in Reif v Nagy (61 Misc 3d 319, 323 [Sup Ct NY County 2018]), Justice Ramos applied the interest analysis to hold that New York's "overwhelming interest in preserving the integrity of its market warrants the application of New York law." This case is no different. If the Plaintiffs' claim to the Princie Diamond is credited, a stolen diamond was delivered in New York to a New York auction house, which for a number of years attempted to privately sell it to a buyer in New York and finally did sell it at a well-publicized and public New York auction. In addition, the defendants availed themselves of New York law in their respective agreements (particularly, the Auction Agreement), brought the Princie Diamond to the Gemological Institute of America in New York for purposes of grading and evaluation, and presented it to numerous private buyers in New York for over three years. The defendants' purported Swiss interest in this matter—regulating behavior within its borders and protecting the reasonable expectations of David Gol, a Swiss citizen residing in Monaco, and Investel, a BVI company—are insufficient, particularly in light of the de minimus contacts that the Princie Diamond has had with Switzerland. To the extent that the defendants cite the interest of Herve Fontaine, another Swiss citizen and Monaco resident, he is not even a party to this action.
The defendants' attempt to immunize an otherwise unlawful conversion by, essentially, passing the allegedly converted item through Switzerland is inappropriate. The rationale behind cases like Balakar and Reif is designed to frustrate this exact behavior. The facts in this case as they relate to Christie's are not complicated. Christie's was aware of the fact that Mr. Milella was being investigated in connection with the criminal conversion of the Princie Diamond and in an attempt to avoid issues of title and avoid litigation, Christie's threatened litigation, including over $20 million in damages. Now they try to claim the benefit of Swiss law under an essential restatement of the situs rule that New York courts have fully rejected. But most importantly, New York clearly has the greater interest in seeking to preserve the integrity of transactions within its borders and preventing the state from becoming a marketplace for stolen goods. As Judge Mishler noted in his analysis in Kunstsammlungen Zu Weimar v Elicofon,
In applying the New York rule that a purchaser cannot acquire good title from a thief, [*12]New York courts do not concern themselves with the question of where the theft took place (emphasis added). Similarly, the residence of the true owner is not significant for the New York policy is not to protect resident owners, but to protect owners generally as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods (536 F Supp 829, 846 [ED NY 1981]).
The Court of Appeals further elaborated on this interest in Lubell (77 NY2d at 320), where its decision was "influenced by our recognition that New York enjoys a worldwide reputation as a preeminent cultural center." New York's reputation as the center of this type of commerce may well have been why the defendants decided to auction the Princie Diamond in New York and not elsewhere. Nevertheless, having done so, particularly in the manner in which they did, now requires the application of New York law. Accordingly, to the extent that the defendants' cross motion seeks to prove that Princie Diamond did not belong to the Senator or that Swiss law governs, this aspect of the cross motion is denied.
The defendants also argue that if the Gol Defendants did acquire the Princie Diamond in bad faith, the conversion claim against them must be dismissed as time barred because the statute of limitations for conversion is three years, and that the statute runs from the time of the alleged conversion, citing Close-Barzinex ex rel. de Bekessy v Christie's, Inc. (51 AD3d 444, 444 [1st Dept 2008]). "The tort of conversion is established when one who owns and has the right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner" (Republic of Haiti v Duvalier, 211 AD2d 379). "Bad faith" however is not an element of conversion. Rather, the two key elements are (1) a plaintiff's possessory right or interest in the property, and (2) a defendant's dominion over the property or interference with it, in derogation of a plaintiff's rights (Pappas v Tzolis, 20 NY3d 228 [2012]). A cause of action for conversion accrues when the conversion takes place. Where the possession of the property is initially lawful, conversion occurs when there is a refusal to return the property after a demand or sooner disposal of the property (White v City of Mount Vernon, 221 AD2d 345 [2d Dept 1995]). Here, the Gol Defendants purchased the Princie Diamond from Mr. Milella and did not "dispose of it" until the Auction in 2013. There is nothing in the record to suggest that the Gol Defendants played any part in Mr. Milella's alleged scheme to embezzle the Princie Diamond. Nor was a demand on them ever made since the Plaintiffs did not become aware of the Princie Diamond's location until shortly before the auction
Accordingly, the conversion claim against the Gol Defendants is not untimely.
The defendants also argue that the replevin claim against Christie's must be dismissed because the Plaintiffs cannot establish that they have a superior right of possession in the Princie Diamond and because it is not currently in their possession. Inasmuch the resolution of the factual issues surrounding the ownership of the Princie Diamond are left for trial for the reasons set forth above, the replevin cause of action cannot be dismissed based on the failure to establish a superior right of possession. However, to the extent that Christie's is no longer in possession of the Princie Diamond, the replevin claim must be dismissed as "a cause of action sounding in replevin must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right" (Batsidis v Batsidis, 9 AD3d 342, 343 [2d Dept 2004] [citing G & S Quality v Bank of China, 233 AD2d 215 [1996]; McGough v Leslie, 65 AD3d 895, 896 [1st Dept 2009]).
The defendants also argue that the conversion claim against Pelham must be dismissed [*13]because Pelham and Guy Bennett were merely acting as "an agent" in negotiating the sale of chattel for a principal, citing the Restatement (2d) of Torts § 231(2) (1979). However, under New York law, an "agent is liable for conversion, even if committed for the benefit of the principal or without intent" (Weyant v Phia Group, LLP, 2018 WL 4387557 [SD NY 2018], citing R.L. Rothstein Corp. v Kerr S.S. Co., 21 AD2d 463 [1st Dept 1964]). Accordingly, the argument fails.
Finally, turning to the defendants' equitable defenses of latches and equitable estoppel, to the extent that the Plaintiffs allege that the defendants have unclean hands, the defendants may not invoke these equitable doctrines on a motion for summary judgment.
II. Motion to Seal (Mtn. Seq. No. 12) is Denied as Defendants Fail to Establish "Good Cause" for Sealing
This is a joint motion by defendants Christie's, Pelham and Guy Bennett to seal certain documents and/or portions of documents in connection with the parties' motions for summary judgment, identified in Exhibit 2 attached to the Affirmation of Catherine A. Williams (Williams Sealing Affirm.) filed in support of this motion. The motion concerns the following two categories of documents: (1) documents that reveal the identity of Christie's and Pelham's clients and (2) certain purportedly sensitive financial and operational information of Christie's and Pelham. During discovery, Christie's and Pelham produced the documents that are the subject of this motion pursuant to a Stipulation and Amended Order for the Production and Exchange of Confidential Information So-Ordered by this court (Ramos, J.) on or about June 30, 2015 (the Confidentiality Order) (Williams Sealing Affirm., Ex. 1; NYSCEF Doc. No. 130). The Confidentiality Order permits the producing party to designate documents or testimony given in connection with this action as "Confidential" (id., ¶ 2). The Protective Order defines "Confidential Information" to include:
trade secrets, proprietary business information, competitively sensitive information, or other information the disclosure of which would, in good faith judgment of the party designating the material as confidential, be detrimental to the conduct of that party's business or the business of any of that party's customers or clients (id., ¶ 3[a]).
The Confidentiality Order also permits the parties to file "any deposition transcripts, exhibits, answers to interrogatories, and other documents which have been previously designated as comprising or containing Confidential Information, and any pleading, brief, or memorandum which reproduces, paraphrases or discloses Confidential Information" under seal "until the Court renders a decision on a sealing motion filed by the parties" (id., ¶ 12[a]). A party seeking to file with the court any material containing Confidential Information must "provide all other parties with seven days written notice of its intent to file such material with the Court so that the Producing Party may file by Order to Show Cause a motion to seal such Confidential Information" (id.).
New York courts have long recognized a "broad presumption that the public is entitled access to judicial proceedings and court records" (Mosallem v Berenson, 76 AD3d 345 [1st Dept 2010]). Civil actions and proceedings, in particular, "should be open to the public in order to ensure that they are conducted efficiently, honestly, and fairly" (id., citing Matter of Brownstone, 191 AD2d 167, 168 [1993] [quotation omitted]). Accordingly, Judiciary Law §§ 255 and 255-b mandate that court records and docket books be available to the public. Before restricting such access to the public, the court must first make "a written finding of good cause, which shall specify the grounds thereof. In determining whether good cause has been shown, the court shall [*14]consider the interests of the public as well as the parties" (22 NYCRR 216.1[a]). While the term "good cause" is not defined, any sealing order "should be clearly predicated upon a sound basis or legitimate need to take judicial action" (Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V., 28 AD3d 322, 325 [1st Dept 2006]). For a finding of good cause, public access to the documents at issue must result in harm to a compelling interest of the movant (Mancheski v Gabelli Group Capital Partners, 39 AD3d 499, 501 [2007]). In case after case addressing sealing, the First Department has, generally, "been reluctant to allow the sealing of court records" (Gryphon Dom., 28 AD3d at 324 [collecting cases]). Confidentiality, in other words, "is the exception, not the rule" (Matter of Hoffman, 284 AD2d 92, 93-94 [1st Dept 2001]). The burden is on the movant "to demonstrate compelling circumstances to justify restricting public access" (Mosallem, supra, 76 AD3d at 349).
Applying this strict standard here, there are no compelling circumstances to seal the identity of the individual who provided the minimum bid guarantee for the Princie Diamond, or the identity of Christie's other clients. Indeed, this court (Ramos, J.) has already rejected the request to conceal the identity of the purchaser of the Princie Diamond on two prior occasions (July 20, 2015 Tr., pp. 18-19; January 5, 2016 Tr., pp. 4-9). Among other things, as the court noted at oral argument on the motion to dismiss Christie's counterclaim, Christie's had not produced any contract requiring Christie's to keep the purchaser at the auction's name confidential. To the extent that Christies relies on paragraph 9 of the minimum bid agreement, which provided that the terms of the minimum bid agreement would be kept confidential "except as otherwise specifically provided herein, as required by law or as necessary in order to enforce its terms," the argument is unavailing. The minimum bid agreement's confidentiality provision is written for the benefit of Christie's, not to hide the identity of the purchaser. If the minimum bidder were to disclose the terms of the minimum bid agreement prior to the auction, a would-be purchaser would know exactly how much more she/he would need to bid to acquire the property. It is for this reason that the minimum bidder is required to indemnify Christie's and Christie's does not provide a reciprocal indemnity for breach of the agreement to the minimum bidder. Simply put, the purchaser at auction had no reasonable expectation based on this document that its name would be kept confidential. As an initial matter, the minimum bid agreement is not the auction agreement and no agreement with respect to the auction has been produced requiring that the name of the successful bidder at auction be kept confidential. More importantly, paragraph 3(c) of the minimum bid agreement specifically reserved the right of Christie's to make an announcement in sum and substance at its sole and absolute discretion concerning the minimum bid agreement itself:
Christie's shall be entitled to issue a saleroom announcement advising buyers that a person or entity having an interest in the Property intends to bid on it, the wording of which shall be decided upon by Christie's in its sole discretion (emphasis added).
Most significantly, mere designation of information as confidential does not guarantee that such information will be kept sealed. Good cause must still be shown. The fact that Christie's argues that the identity of its clients is irrelevant to the issues in this action is also not a compelling reason to restrict the information from the public. Pelham's argument that disclosure of the client's identity would impact the auction is equally unpersuasive; the auction already took place. To the extent that Pelham argued at oral argument on this motion that disclosure of the client's identity could disadvantage the client in future auctions or purchase negotiations, this is hardly a compelling reason to restrict public access. Nor are there any compelling reasons to [*15]seal Christie's and Pelham's emails, contracts or other documents as containing "proprietary information" since as Guy Bennett testified on behalf of Pelham, these documents contain "standard" provisions (Kelly Affirm., Mtn. Seq. 012, Ex. 2, Bennett Dep., pp. 59-60). Moreover, the issues concerning guaranteed minimum bids and sale of property at public auction houses may be said to be of some importance to the general public. Finally, Christie's fails to identify what information in these documents from approximately six and eight years ago expose its business information and strategy so as to harm its "present-day business." Accordingly, the motion to seal is denied.
III. Leave to File A Second Amended Answer to Third Amended Complaint (Mtn. Seq. 13) Denied
Christie's seeks leave to file a Second Amended Answer (the Proposed Second Amended Answer) because it claims that "[i]n preparing its response to Plaintiff's Motion for Partial Summary Judgment, Christie's notices a few inaccuracies" concerning certain affirmations it made in its Amended Answer (Christie's Supp. Memo, p. 4). Specifically, Christie's affirmed that:
(1) "David Gol and/or Ishaia Gol purchased the Princie Diamond" (Christie's Am. Answer, ¶ 6);
(2) "on or about October 10, 2010, David Gol and Ishaia Gol provided funds for Investel to wire $19.2 million to Mr. Milella for the purchase of the Princie Diamond" (id., ¶ 86);
(3) "David Gol and Ishaia Gol received the proceeds of the April 16, 2013 auction of the Princie Diamond pursuant to the Consignment Agreement (id., ¶ 95); and
(4) "Investel, David Gol and Ishaia Gol purchased and acquired the Princie Diamond and subsequently consigned the Princie Diamond for auction on April 16, 2013" (id., ¶129).
Christie's now claims that those statements were inaccurate because it claims a review of the evidence has shown that Investel, not David and Ishaia Gol, purchased the Princie Diamond and received the proceeds from its sale. Christie's sought the Plaintiffs' consent to file its Proposed Second Amended Answer, but the Plaintiffs refused.
CPLR § 3025(c) permits a party to amend its pleading to conform to the evidence. Leave to amend is, generally, liberally granted absent "prejudice or surprise resulting directly from the delay, or if the proposed amendment is palpably improper or insufficient as a matter of law" (McGhee v Odell, 96 AD3d 449, 450 [1st Dept 2012]). Contrary to Christie's argument that no prejudice would result from the proposed amendment, these are admissions regarding highly material facts which were relied on by the Plaintiffs during the course and conduct of discovery and cited in their motion for partial summary judgment. Moreover, Christie's did not suddenly learn this new information so as to justify this late amendment as any documentary evidence relating to these admissions was plainly within Christie's possession and/or knowledge. Accordingly, leave to file a Second Amended Answer to the Third Amended Complaint is denied.
IV. Motion to Compel Production (Mtn. Seq. No. 14) is Granted Based on At-Issue Waiver
As noted above, Christie's has asserted that upon learning of the Italian news reports concerning Mr. Milella, the missing Princie Diamond and Other Valuable Jewelry and the raid on Mr. Milella's home in March of 2013, it hired counsel in multiple jurisdictions to conduct a "robust" and "extensive" investigation of the ownership history of the Princie Diamond, including whether Mr. Milella was the prior owner (Kelly Affirm., Ex. 2, S. Cobden Dep., pp. [*16]56-65, 69-71, 91-93, 118-119, 124-132, 135-136, 163-165, 215-218, 227-228). The Plaintiffs move to compel production of communications between Christie's and its investigatory counsel, because Christie's now argues in support of its cross-motion for summary judgment that it had no concerns of any legal issues in moving forward with the auction despite the title issues raised by the Plaintiffs and the Italian prosecutor because of the results of the aforementioned investigation.
In its opposition papers, Christie's argues that the Plaintiffs have already made this application before the court (Ramos, J.) in February 2017 and Justice Ramos had rejected it following an in camera review in March 2017. In this respect, Christie's submits an internal email document from attorney David Weiner to Christie's Sandra Cobden, dated March 13, 2017 that reads:
Here's the report from today's discovery conference with Justice Ramos, which the Court conducted without a court reporter.
1. Justice Ramos reviewed in camera the privileged attachments to C's March 2013 Pre-Sale Due Diligence Checklist (a series of e-mails between you and Francois, cc-ing others) and agreed that Christie's need not disclose them to Plaintiffs. After reading them, Justice Ramos told Plaintiffs' counsel Ed Kelly that "there's nothing there" and "you wouldn't want these anyway"
2. Justice Ramos also stated that he would review in chambers the foreign law opinions that C.'s commissioned in March 2013 from Lalive and its Italian law firm, and would shred them thereafter. He showed no inclination to require C.'s to give these documents to Plaintiffs; Kelly ultimately remarked that he didn't want the legal opinions, but only the unprivileged facts they contain (Weiner Affirm., Ex. 5; NYSCEF Doc. No. 478).
The rest of the above email is "redacted to exclude extraneous materials" (Weiner Affirm., ¶ 7).
The Plaintiffs disagree with Christie's characterization of Justice Ramos' prior position. As an initial matter, they persuasively argue the court could not have addressed the issues it now raises with respect to Christie's cross-motion for summary judgment because Christie's had not yet filed its cross motion for summary judgment relying on, inter alia, the report in question as the cross motion was filed in 2018, not 2017 when Justice Ramos reviewed the report in camera. In addition, the Plaintiffs argue that Justice Ramos warned Christie's that if Christie's withheld these privileged documents and later had any of its witnesses rely on advice from counsel and/or the results of its investigation, he would halt the proceeding and order disclosure (Ptf. Reply Mem., p. 3). According to the Plaintiffs' unsworn account, the Court never addressed "at issue" waiver in 2016, but rather:
In 2016, Plaintiffs, in a conference call with the Court, requested that the Court allow Plaintiffs to submit a motion to compel disclosure of facts revealed in Christie's investigation because [Christie's] Cobden was wrongly directed at her deposition by Defendant Christie's counsel not to disclose any "facts" revealed in Christie's investigation if they were learned by counsel hired to conduct an investigation, despite the clear case law which holds that the attorney-client privilege "does not protect disclosure of the underlying facts by those who communicated with the attorney." Upjohn Co. v U.S., 449 US 383, 395 (1981). Spectrum Sys. Int'l Corp. v Chemical Bank, 157 AD2d 444 (1st Dept 1991). The Court suggested an in camera review of the documents instead of the parties engaging in motion practice. That the court was [*17]addressing at issue waiver is completely nonsensical as it is impossible for a court to determine whether any privileged communication was put at issue by only reviewing the privileged documents—and nothing more. Justice Ramos did not find non-privileged information and facts that should not have been disclosed despite Christie's portrayal of its investigation as revealing information and facts that show Milella had title and Plaintiffs could not support their claims (Ptf. Reply Mem., pp. 3-4)
Based on these contradictory accounts, the Court cannot determine what may or may not have been previously decided. Accordingly, the Court addresses the arguments de novo. In its cross-motion for summary judgment, which is presently before the court, Christie's has argued that it relied on, among other things, its investigation in going ahead with the auction. Justice Ramos' prior decision is immaterial to this issue as it predates the filing of the instant motions. Christie's cannot selectively invoke the investigation without turning over the communications concerning said investigation. Having done so, it has placed the contents of the communications at issue in this action and is directed to produce these to the Plaintiffs within 14 days of entry of this order.
V. Motion for Sanctions (Mtn. Seq. No. 015) is Denied as Conduct Does Not Rise to Level of Sanctions
In their motion for sanctions, the Plaintiffs claim that the defendants falsely accuse them of comparing their situation to the horrific events of the Holocaust and comparing themselves to the "Jewish families persecuted by the Nazis" (Defs. Reply Brief, p. 9, NYSCEF Doc. No. 471). The section the Plaintiffs refer to falls under the point heading, "Plaintiffs — Heirs of Man 'More Important than Berlusconi' — Cannot Excuse Their Lack of Proof by Comparing Themselves to Victims of the Holocaust." It reads:
The Angiolillos' comparison of their situation to that of Jewish families persecuted by the Nazis is both offensive and inapposite. Plaintiffs rely heavily on two cases addressing artworks by Egon Schiele that were found to have been owned by Fritz Grunbaum, a Viennese Jewish art collector who died in the Dachau concentration camp in 1941. See Bakalar v Vavra, 619 F 3d 136, 138 (2d Cir 2010) (see Pl. Opp. passim); Reif v Nagy, 61 Misc 3d 319, 321 (Sup Ct 2018) (see Pl. Opp. 6). Because of the particular facts and claims in Bakalar and Reif, the Grunbaum heirs had to make only a "threshold showing" of an "arguable" claim to the works at issue; the burden then shifted to the current possessors to show the works were not stolen. In this case, by contrast, Plaintiffs bear the burden of proving ownership of the pink diamond (id., p. 9).
In opposition to the sanctions motion, the Defendants stand by their analysis as appropriate because they claim the Plaintiffs compared their situation to that of Jewish families who were the victims of the Holocaust. They maintain that, "[f]ar from being sanctionable, the response offered by Defendants was entirely accurate." (Def. Opp. Memo., p. 2, NYSCEF Doc. No. 487).
Read generously, it seems that what the defendants may have attempted to do was distinguish Bakalar and Reif, the two cases primarily relied upon by the Plaintiffs, by characterizing the holdings of those cases narrowly as only applying to stolen art cases arising from the Holocaust or similar events. However, unable to cite any authority for this proposition, the defendants resorted to an ad hominem attack. This is not something to be proud of nor something that the court wishes to encourage. However, the Plaintiffs do not cite to any authority that would warrant imposing sanctions on such a record (cf. Matter of Kavanaugh, 597 [*18]NYS2d 24, 26 [1st Dept 1993]; Nachbaur v American Trust Ins. Co., 752 NYS2d 74, 74-74 [1st Dept 2002]). The motion for sanctions is therefore denied.
Accordingly, it is
ORDERED that the Plaintiffs' motion for partial summary judgment is denied and the defendants' cross motion for summary judgment (mtn. seq. no. 011) is granted only with respect to the replevin cause of action asserted against Christie's, Inc., the replevin cause of action (the 2nd cause of action) is dismissed, and the motion is otherwise denied; and it is further
ORDERED that the defendants' motion for sealing (mtn. seq. no. 012) is denied; and it is further
ORDERED that the motion for Christie's to file a second amended answer (mtn. seq. no. 013) is denied; and it is further
ORDERED that the Plaintiffs' motion to compel (mtn. seq. no. 014) is granted, and Christie's is directed to produce the communications relating to its investigation within 14 days of entry of this order; and it is further
ORDERED that the Plaintiffs' motion for sanctions (mtn. seq. no. 015) is denied; and it is further
ORDERED that the parties appear for a pre-trial conference in Part 53, 60 Centre Street, on May 28, 2019 at 11:30 A.M.
Dated: April 26, 2019
Andrew Borrok, J.S.C.



Footnotes

Footnote 1:Following jurisdictional discovery, this action was discontinued as against Herve Fontaine and his company Diamfeld, Ltd. pursuant to a Stipulation and Order dated May 17, 2018 for lack of personal jurisdiction (NYSCEF Doc. No. 306).

Footnote 2:Under Italian law, the statute of limitations begins to run after the first act of misappropriation occurs and is not tolled during the pendency of the litigation (Kelly Affirm., Ex. 31).